[No. A048790. First Dist., Div. Three. Oct. 22, 1991.]

MICHAEL A. GRAPPO, Plaintiff and Appellant, v.
COVENTRY FINANCIAL CORPORATION et al., Defendants and
Respondents.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III and VI.

## COUNSEL

John Starbuck for Plaintiff and Appellant.

Coblentz, Cahen, McCabe & Breyer, Jonathan R. Bass, Jeffrey S. Cogen, Ned Robinson, Thomas & Porrazzo, Scott L. Thomas, Leland, Parachini, Steinberg, Flinn, Matzger & Melnick, Steven R. Walker and Michael J. Forkin for Defendants and Respondents.

## OPINION

**MERRILL, Acting P. J.**—Michael A. Grappo appeals from a judgment finding that he had no community property interest in certain real property located in Incline Village on Lake Tahoe in Nevada; that he was not entitled to the imposition of an equitable lien on the property; and that he had no interest in the property entitled to priority over the claims of respondents. It should be noted initially that in this proceeding appellant is not seeking to recover an indebtedness on the basis of a loan transaction but is claiming an interest in real property. We affirm the judgment.

# I

## FACTUAL AND PROCEDURAL HISTORY

Respondent Tillie D. Grappo and appellant Michael A. Grappo were married in 1974 and based on appellant's testimony the trial court found they separated in 1979.[1] Both parties had been married previously and had families from those marriages. Appellant had retired from his 25-year career as an agent of the Internal Revenue Service. He was an active real estate investor. Since his retirement, he actively managed a large number of real estate investments. Aside from the pension he received from the Internal Revenue Service, appellant received income in the form of rents from 25 parcels of real estate which he owned in his own name. Appellant was also an attorney, an accountant, and a licensed real estate broker.

In 1977, respondent acquired three unimproved lots on Lakeshore Drive, Incline Village, Nevada, one of which was 1046 Lakeshore Drive, the property at issue in this case. She acquired this property in her own name, as her separate property, with funds obtained by her through a bank loan. Appellant was aware of the fact that the property was acquired by respondent as her separate property, and acknowledged this fact at trial.

Appellant and respondent resided together in Alameda, California, until late 1979, when respondent moved to one of her properties on Lakeshore in Incline Village. Although from time to time the parties would visit each other at their respective residences in Alameda, California, and Incline Village, Nevada, appellant testified that he and respondent never resumed residence together after 1979. Appellant filed for a dissolution of the marriage in 1983, but did not prosecute it. According to appellant, he wanted the marriage to be terminated in 1979, and considered himself separated from respondent as of that time.

Appellant testified that since the beginning of this marriage with respondent, they had kept their property segregated, in order that their separate property would remain separate and not be commingled with or transmuted to community property. It was appellant's intention, which he made clear to respondent, that all property acquired by either of them during their marriage was to remain the separate property of the person acquiring it. In addition, appellant and respondent had "an explicit understanding" that any incremental increase in value to each party's separate property attributable to their

---

[1] References to "respondent" in the singular are to respondent Tillie Grappo. References to "respondents" in the plural are to all of the respondent parties in this appeal. All other references to individual respondents other than Tillie Grappo will be by name.

personal time and effort spent managing and supervising such property would also be separate property, and not community property.

After the parties separated in 1979, respondent began the construction of a house on the property with which we are now concerned in Incline Village. Respondent originally intended to borrow the money for the construction project through her son-in-law, James R. Schuler. Fearing that this would give either a bank or respondent's son-in-law an interest in the property, and desiring to provide respondent with a source of income that would lessen his exposure for alimony after a dissolution of the marriage, appellant actively discouraged respondent from obtaining the money from Schuler and instead provided respondent with the construction funding himself. First, he loaned her $41,000 in 1980. This money was used to pay off the outstanding balance on the bank loan which respondent had used to purchase the Incline Village properties. As a condition of this loan, appellant had respondent execute a promissory note secured by a deed of trust on some of her separate property in Alameda, California. Next, appellant loaned respondent $40,000 in 1981; he also had her execute an agreement or "receipt" to repay this loan.

After this, appellant continued to provide money to respondent for construction of the house on the property, but without any formal documentation. Appellant testified that he considered these to be loans made to respondent on her oral promises or agreements to repay. Although appellant repeatedly pressed respondent both orally and in writing to give him some security for these funds in the form of deeds of trust, she consistently refused to do so. She never gave appellant any deed of trust to the property at issue in this case, and never agreed that she would do so in the future. Nevertheless, despite respondent's refusal to give him a promissory note and deed of trust, his attorney's advice that he obtain such security, and his own experience as an attorney, an accountant and a real estate broker, appellant continued to advance funds to respondent for the construction of the house on the property. Even after threatening to cut off the funding in January 1983 if she failed to execute a note and deed of trust, appellant still continued to advance money to respondent for several more years.

Aside from lending respondent money to complete the construction of the house, appellant assisted respondent by generally overseeing the construction contractors, dealing with disputes and adjustments with the contractors and local government agencies, and helping respondent to buy materials. At trial, appellant estimated that he spent at least 10 hours a week working on the project.

On all the checks which appellant sent to respondent he wrote " 'loans for construction of 1046 Lakeshore Drive.' " Respondent acknowledged that she also considered these payments to be loans. Appellant never intended these payments to respondent as gifts; from the outset, it was his intention to be repaid. He expected that he would receive at least partial repayment from the sale either of the property itself with the new house, or of an adjoining parcel of property also owned by respondent. At trial, appellant testified that he always assumed that he was protected by some form of unwritten, equitable "lender's lien" on the property because his money was used to fund the construction of the house. However, in contemporaneous written memoranda made in appellant's own bookkeeping and accounting files and ledgers, he notated his loans to respondent as being "unsecured."

After the construction of the residence was completed, appellant again told respondent that he wanted a promissory note and deed of trust on the property to secure his repayment for the money he had loaned her. According to appellant, respondent suggested either putting the property into a form of cotenancy with a life estate in appellant and respondent, with the remainder in respondent's children, or else selling the property "when the market was good." Although appellant did not agree to either of these proposals, he never presented respondent with a note and deed of trust for her to execute.

In 1984, appellant entered into discussions with respondent and her son-in-law, James Schuler, about transferring to Schuler appellant's rights to repayment for the money he had lent respondent, in return for some interest in Schuler's oil and gas engineering company. The entire purpose of these discussions was to determine a way to pay off appellant's loans to respondent.[2] Although some documents were drawn up, they were never finally executed, and no exchange took place.

Appellant continued to ask respondent for a note and deed of trust "from time to time." However, he continued to do nothing else to secure any interest in the property. At some point, respondent sold Schuler an interest in the property. Schuler, his wife and respondent then borrowed $350,000 from A. David Lerman, doing business as Lerman Mortgage Company. This loan was secured by the property. Schuler, his wife and respondent subsequently

---

[2]According to appellant's trial testimony, his loans to respondent amounted to $733,000 at the time of his discussions with Schuler. The complaint itself alleges that appellant loaned respondent "in excess of $450,000.00 of his separate property . . . for the purpose of constructing buildings and appurtenances on the [property], and lent substantial other funds as well to [respondent]"; it further states that respondent had agreed to an interest rate of 12 percent on the principal amount of the loans appellant made to her. The complaint prayed for imposition of an equitable lien in an amount "in excess of $1,000,000.00" on the subject property.

defaulted on their payments to Lerman, and the latter initiated foreclosure proceedings. Claiming an interest in the property, appellant thereupon filed the instant action seeking a declaration that his interest in the property was prior and superior to that of Lerman; an order enjoining the foreclosure; an equitable lien in excess of $1 million on the property; and damages according to proof.[3]

At the parties' first appearance before the trial court, upon the suggestion of Lerman and Coventry, the trial court bifurcated the proceedings so that the first thing tried would be appellant's claim to a community property or equitable interest in the property; and only after that would appellant's further claims for relief be tried. Appellant conceded that he would have to prove his equitable and community property interest in the property in order to prevail on all the causes of action in his complaint. After a nine-day court trial on the initial bifurcated issues, the trial court issued its statement of decision finding that appellant had no community property interest in the property; that he was not entitled to an equitable lien; and that the respondents were therefore entitled to judgment. Judgment was entered in accordance with the statement of decision, and this appeal followed.

## II

### BIFURCATION OF ISSUES AT TRIAL

Appellant's first contention is that the trial court erred in bifurcating the issues to be tried. The contention is unmeritorious.

The bifurcation of the trial below arose from the necessity of establishing the existence of appellant's claimed interests in the property prior to determining whether Lerman's deed of trust should be subordinated to, or invalidated by, those interests. The decision to bifurcate was based on the obvious futility of inquiring into the issue of whether appellant had been improperly divested of an interest in the property before determining whether or not appellant actually had any interest of which he could be divested. (*Tinney* v. *Tinney* (1963) 211 Cal.App.2d 548, 554-555 [27 Cal.Rptr. 239].)

Nevertheless, appellant urges that the trial court erred in setting the order of proof in the way it did because no formal motion to bifurcate had been

---

[3]Aside from respondent, Schuler, his wife and Lerman, the complaint named a number of other defendants. The complaint alleges that Coventry Financial Corporation (Coventry) is the alter ego of Lerman; that North American Title Company (North American) and Ticor Title Insurance Company (Ticor) were employed by Lerman to ascertain the existence of any competing interests in the property; and that the Northern Nevada Title Company (Northern Nevada) was acting as the agent and representative of Lerman and Coventry in the foreclosure.

made 30 days prior to trial in accordance with Code of Civil Procedure section 598. Appellant's argument fails to take into account the provision of that statute that states that a trial court may, "on its own motion," make an order setting the precedence of issues for trial "at any time." Here, no motion to bifurcate was made; rather, respondents offered a "suggestion" as to the order of proof, to which appellant responded in writing. As the trial court made clear at the beginning of trial, it was making the order on its own motion.

The trial court had ample authority to make this discretionary decision. Aside from the language in Code of Civil Procedure section 598, which concerns pretrial motions, Evidence Code section 320 provides that "[e]xcept as otherwise provided by law, the court in its discretion shall regulate the order of proof." Similarly, Code of Civil Procedure section 1048, subdivision (b) states that a trial court, "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any cause of action . . . or of any separate issue or of any number of causes of action or issues . . . ." Under these provisions, trial courts have broad discretion to determine the order of proof in the interests of judicial economy. (*Buran Equipment Co.* v. *H & C Investment Co.* (1983) 142 Cal.App.3d 338, 343-344 [190 Cal.Rptr. 878].)

As appellant himself conceded on the record, the proof of any of his causes of action required the initial threshold determination that he had an interest—whether styled "equitable" or "community"—in the property. The trial court did not abuse its broad discretion in determining that the issue of the existence of appellant's interest would best be tried first, before consideration of the various other issues raised by the causes of action in appellant's complaint.

III

EXCLUSION OF EVIDENCE*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 496.

## IV

## CHOICE OF LAW

██ Appellant next urges that in considering his claim of a community property interest the trial court erred in applying California rather than Nevada law. Appellant's argument is unpersuasive.

It is true, as appellant states, "[t]he general rule is that questions relating to interests in real property are determined by the law of the situs." (*Barber* v. *Barber* (1958) 51 Cal.2d 244, 247 [331 P.2d 628].) However, as is pointed out in the very Supreme Court case cited by appellant for this principle, this rule does *not* apply "where the funds used for the purchase were acquired by spouses while domiciled in another state . . . ." (*Ibid.*)

"Generally, the court looks to the domicile of the parties at the time the property was acquired to characterize the property as separate or community." (4A Powell on Real Property (1991) Community Property, 626[1], pp. 53-91—53-92, fn. omitted.) As a rule, marital interests in money and property acquired during a marriage are governed by the law of the domicile at the time of their acquisition, even when such money and property is used to purchase real property in another state. (*Rozan* v. *Rozan* (1957) 49 Cal.2d 322, 326 [317 P.2d 11]; *Ford* v. *Ford* (1969) 276 Cal.App.2d 9, 11 [80 Cal.Rptr. 435]; *Haws* v. *Haws* (1980) 96 Nev. 727 [615 P.2d 978, 980-981]; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Community Property, § 16, p. 387; 4A Powell on Real Property, *op. cit. supra*, 626[4], [5], pp. 53-96— 53-97; McClanahan, Community Property Law in the United States (1982) Conflict of Laws, § 13.12, p. 601.) "Property rights are not lost simply because property is transported into another state and exchanged there for other property." (*Tomaier* v. *Tomaier* (1944) 23 Cal.2d 754, 759 [146 P.2d 905].)[4]

Here, the state in which appellant and respondent were domiciled during their marriage from 1974 to 1979, prior to their separation, was California. It

---

[4]The choice of law rules in Nevada would produce the same result. In *Haws* v. *Haws, supra,* 615 P.2d 978, the Nevada Supreme Court ruled that, contrary to the situs rule generally applicable to issues regarding interests in real property, community property issues are decided on the basis of the marital domicile rather than the physical location of the real property. As the court stated: "During oral argument, [wife's] counsel indicated that [wife] sought an adjudication of property rights in Nevada because she believed [husband's] real estate purchases in Nevada, following their separation, were community property. [¶] The division of the community property is governed by California law because California was the marital domicile and [wife's] residence at the time of the dissolution. California Civil Code § 5118 provides that earnings and accumulations of a spouse following separation are classified as separate property. Therefore, after separating from [wife] in 1973, [husband's] acquisitions were his separate property." (*Id.,* at p. 981.)

was here that the parties were living at the time that respondent purchased the subject property. California was also the state in which appellant resided throughout the time that he supplied the money for the costs of construction of the house on the property, by means of loans to respondent of his own funds. Moreover, it is only appellant—a California resident—who has asked the court to apply Nevada law in this case. All of the individual parties to this action, with the possible exception of respondent Tillie Grappo, are also California residents. Respondent herself asks that California law be applied, and objects to the application of Nevada law. Under standard choice of law principles, it is apparent that California, and not Nevada, is the state which has the most significant relationship to the parties and issues in this case. (Rest.2d, Conf. of Laws, §§ 6, 222.) In the instant case, we are not concerned with a conveyance transaction under real property law, but are determining the respective rights of married persons under family law.

Under the facts presented and the applicable choice-of-law rules, therefore, we conclude that the characterization of the parties' respective marital interests in the subject property must be determined under the community property law of California. (*Tomaier* v. *Tomaier, supra,* 23 Cal.2d at p. 759; *Haws* v. *Haws, supra,* 615 P.2d at pp. 980-981; 11 Witkin, Summary of Cal. Law, *op. cit. supra,* Community Property, § 16, p. 387; 4A Powell on Real Property, *op. cit. supra,* 626[4], [5], pp. 53-96—53-98; McClanahan, Community Property Law in the United States, *op. cit. supra,* § 13.12, p. 601.) Appellant himself states that his claim is not a contractual one, but is based on the fact that he was married to respondent and that he acquired a community interest as a result of his advancement of funds and his contribution of time, labor and skill to the property. Thus, the trial court's choice of California law was correct.

V

ABUSE OF DISCRETION

Appellant next argues that the trial court "abused its discretion" in failing to find that he possessed either a community property interest or an equitable lien in the subject property. This argument is essentially a contention that the trial court's decision was not supported by substantial evidence.

█ The standard of review of a claim that a judgment is unsupported by the evidence in the record is well established. We must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of

the judgment. (*Campbell* v. *Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121]; *Chodos* v. *Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 97 [178 Cal.Rptr. 831]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, pp. 289-291.) We must accept as true all evidence and all reasonable inferences from that evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment. It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trial court. Our authority begins and ends with a determination of whether, on the entire record, there is any "substantial" evidence, contradicted or uncontradicted, which will support the judgment. (*Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691, 697 [139 Cal.Rptr. 700, 566 P.2d 602]; *Estate of Teel* (1944) 25 Cal.2d 520, 526-527 [154 P.2d 384]; *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Henry* v. *Sharma* (1984) 154 Cal.App.3d 665, 670 [201 Cal.Rptr. 478]; *Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925]; *McKinney* v. *Kull* (1981) 118 Cal.App.3d 951, 955 [173 Cal.Rptr. 696].) As long as there is such evidence, and it is "substantial"—that is, of "ponderable legal significance," "reasonable in nature, credible, and of solid value"—we are bound to uphold the judgment. (*United Professional Planning, Inc.* v. *Superior Court* (1970) 9 Cal.App.3d 377, 392-393 [88 Cal.Rptr. 551]; *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]; 9 Witkin, *op. cit. supra*, §§ 281, 285, pp. 292-293, 296.)

*Community Property Interest*

■ Appellant contends that his contributions to the construction of the residence gave him a community property interest in the property which would bar the effectiveness of the allegedly forged quit claim deed, invalidate the deed of trust to Lerman, and prohibit the foreclosure sale. He bases his argument primarily on Nevada law, but alternatively contends that he had a community interest even under California law.

Having determined that the trial court was correct in applying California law, the question is whether there is substantial evidence to support the trial court's conclusion that the underlying property itself was respondent's separate property, and that appellant's contributions to the construction of the residence thereon did not give him a community property interest under California law. We conclude that there is such substantial evidence.

At the time in 1977 that respondent purchased the property in Incline Village, Nevada, appellant and respondent were married and living together in Alameda, California. However, the usual presumption that the purchase was a community one is effectively rebutted by the fact that the parcel was

purchased entirely with respondent's separate property. The evidence was clear that appellant and respondent had an express agreement that any property purchased in the course of their marriage in their individual names would be the separate property of the spouse in whose name the property was purchased. Appellant acknowledged at trial that the subject property was originally purchased in respondent's own name, with her separate funds, and was her separate property.

When the residence was subsequently built on the property beginning in 1979, the parties had already separated. To the extent appellant's own earnings were thereafter used to pay for the construction of the residence, those funds were necessarily his separate property under the law of the state of his domicile, i.e., California. (Civ. Code, § 5118.) Appellant has never contended that the monies he sent to respondent for construction of the residence on the property came from community sources; neither is there any evidence to this effect. To the contrary, all of appellant's own trial testimony and the evidence of his actions support the conclusion that the funds used in the subject construction on the property were personal loans to respondent of appellant's separate property, for which he repeatedly requested a promissory note and deed of trust on the property.

It is evident that appellant's advances to respondent of his separate property, after the separation of the parties, and for the construction of a residence on a parcel of land acknowledged to be her separate property, could not result in the creation of a community property interest. In fact, until the filing of the complaint in this case, there is *no* evidence in the record that appellant ever considered the property or the residence thereon to be community property. Appellant never conceived of the residence he was helping respondent to build to be anything other than respondent Tillie Grappo's separate property, which he hoped would lessen his potential financial exposure at the time of his anticipated dissolution of marriage from respondent. The trial court's decision that appellant had no community interest in the property is therefore supported by the evidence.[5]

---

[5]Even if we were to assume that Nevada law was applicable to the determination of the respective interests in the subject property, the result would be the same. Appellant argues that under Nevada law the efforts, industry and labor of a married person may continue to inure to the benefit of the community until the marriage is formally dissolved, a decree of separate of maintenance is entered, or it is otherwise provided by an agreement in writing between the parties. (Nev. Rev. Stat. § 123.220; *Forrest* v. *Forrest* (1983) 99 Nev. 602 [668 P.2d 275, 277-279.) Nevertheless, in choice of law cases involving marital property interests, whether real or personal, Nevada follows the rule that the law of the marital domicile applies. (*Haws* v. *Haws, supra*, 615 P.2d at p. 981; *Braddock* v. *Braddock* (1975) 91 Nev. 735 [542 P.2d 1060, 1062-1063]; *Choate* v. *Ransom* (Nev. 1958) 323 P. 2d 700, 702-704 [323 P.2d 700].) If property deemed separate in a different state of domicile is subsequently brought into Nevada and used there, it will continue to be treated as separate property under Nevada law. (*Haws* v. *Haws, supra*, 615 P.2d at pp. 980-981; 4A Powell on Real Property, *op. cit. supra*, 626[5],

*Equitable Interest*

█ Appellant's alternative position is that his advancement of funds to respondent for the construction of the residence on the subject property gave him an inchoate equitable interest in the property, and that the trial court's decision that he was not entitled to an equitable lien was an abuse of discretion. Once again, we disagree.

In general, equity will create a lien on property where this is necessary to accomplish substantial justice and protect creditors. Thus, courts will construe the existence of equitable liens where the parties have erroneously created a defective mortgage (*Burns* v. *Peters* (1936) 5 Cal.2d 619, 625 [55 P.2d 1182]; *Clayton Development Co.* v. *Falvey* (1988) 206 Cal.App.3d 438, 443; 3 Witkin, Summary of Cal. Law, *op. cit. supra*, Security Transactions in Real Property, §§ 13-14, pp. 526-528); where, despite the lack of any formal mortgage or deed of trust it is apparent that the parties intended to create a security interest in property (*Coast Bank* v. *Minderhout* (1964) 61 Cal.2d 311, 314-315 [38 Cal.Rptr. 505, 392 P.2d 265]; *Kaiser Industries Corp.* v. *Taylor* (1971) 17 Cal.App.3d 346, 350-352 [94 Cal.Rptr. 773]); where the parties have otherwise clearly attempted or intended to make real property security for an obligation (*McColgan* v. *Bank of California Assn.* (1929) 208 Cal. 329, 338 [281 P. 381, 65 A.L.R. 1075]; *Lentz* v. *Lentz* (1968) 267 Cal.App.2d 891, 894 [73 Cal.Rptr. 686]; 3 Witkin, Summary of Cal. Law, *op. cit. supra*, § 17, p. 530); or, even in the absence of any agreement, where it is necessary to prevent unjust enrichment (*Smith* v. *Anglo-California Trust Co.* (1928) 205 Cal. 496, 504 [271 P. 898], overruled on other grounds in *Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 590-591 [15 Cal.Rptr. 821, 364 P.2d 685]; *Jones* v. *Sacramento Sav. & Loan Assn.* (1967) 248 Cal.App.2d 522, 529-531 [56 Cal.Rptr. 741]; *Hayward L. & I. Co.* v. *Coast etc. Assn.* (1941) 47 Cal.App.2d 211, 214 [117 P.2d 682]; 3 Witkin, Summary of Cal. Law, *op. cit. supra*, §§ 17-19, pp. 530-532).

None of these conditions is found in the instant case. The parties have not created any defective mortgage or deed of trust. To the contrary, despite appellant's continual requests to respondent for a deed of trust on the property, respondent consistently refused to give him any security interest. Despite this fact, appellant continued to advance the funds for construction of the residence.

---

pp. 53-97—53-98.) The funds used to build the residence in Nevada came from California where appellant was domiciled. These funds were entirely appellant's separate property under California law. Consequently, under Nevada law, they would also be treated as his separate property rather than as a community contribution.

Neither is there any evidence that the parties jointly intended to create a security interest in the property for appellant's benefit. The testimony and evidence adduced at trial shows that respondent never had that intention, and in fact rejected every suggestion that such an interest be created. Certainly, one party cannot unilaterally obtain a security interest in property simply by advancing funds to another party with the expectation that some court will subsequently construe such an interest to have been created in the other person's property. In this instance, it would be inequitable to find the existence of an intent on the part of both parties to create a security interest in the property, based solely on appellant's claim that he thought his advances of construction funds would give him such an interest.

Appellant contends that even in the absence of any agreement, understanding or intent between himself and respondent, an equitable lien should have been construed in this case in order to prevent unjust enrichment of respondent. Although the courts have on occasion created equitable liens on such grounds, we agree with the trial court that there is no justification for such a finding under the facts of this case.

Appellant was a former Internal Revenue Service agent, an attorney, an accountant, a real estate broker, and a highly experienced real estate investor. He handled many of respondent's financial affairs for her. The evidence shows that appellant actually prevailed upon respondent to accept advances of money from him for the construction of the residence, and discouraged her from obtaining financing through her son-in-law, Schuler. He testified that his intention in doing so was both to provide his estranged wife with a substantial asset in order to lessen his potential exposure for alimony and spousal support upon a divorce, and to prevent Schuler from himself obtaining any interest in the property. Appellant constantly demanded that respondent give him a deed of trust to the property to secure his advances, and in fact did obtain security interests in some of her other separate property. Nevertheless, he continued to advance funds even after repeatedly being rebuffed in his attempts to obtain a deed of trust on the property itself.

In short, the evidence shows that appellant could not possibly have nurtured any realistic expectation of obtaining a security interest in the property. To establish the existence of such an equitable interest under the circumstances of this case would actually be inequitable and unjust to respondent, who consistently refused to give appellant any security interest in the property. She should not now be burdened with a judicially construed equitable lien in his favor simply because she accepted his proffered largesse. Appellant must be considered competent by virtue of his training and experience to have appreciated the consequences of his actions under these

circumstances. In short, the trial court did not err in denying his claim for an equitable interest.

## VI

### STATEMENT OF DECISION*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## VII

### DISPOSITION

The judgment is affirmed.

Strankman, J.,[†] and Chin, J., concurred.

A petition for a rehearing was denied November 19, 1991, and appellant's petition for review by the Supreme Court was denied February 11, 1992.

---

*See footnote, *ante*, page 496.

[†]Presiding Justice of the Court of Appeal, First District, Division One, sitting under assignment by the Chairperson of the Judicial Council.