Filed 4/3/13  Molinari v. Tebo CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| SCOTT MOLINARI et al., | C067139 |
| Plaintiffs, Cross-defendants and Appellants, | (Super. Ct. No. CV032014) |
| v. | |
| STEPHEN TEBO, | |
| Defendant, Cross-complainant and Respondent. | |

In this action for damages for breach of a lease, plaintiffs and cross-defendants Scott Molinari and Luz Molinari doing business as Minerva's (collectively Molinari) appeal from a judgment entered after a nonjury trial awarding defendant and cross-complainant Stephen Tebo doing business as Tebo Development Co. (Tebo) certain amounts of rent as damages on the cross-complaint and denying Molinari all relief upon his complaint.  We affirm the judgment.

1

FACTS AND PROCEEDINGS

Molinari operated a furniture business in Lodi, California. Tebo, who resides in and conducts his business from Colorado, owns an approximately 15,805 square foot commercial building in Lodi. The building includes a first floor and a basement, which are connected by stairs as well as a freight elevator.

On April 30, 2002, Molinari and Tebo executed a one-year lease agreement for 5,400 square feet of the first floor of Tebo's building for Molinari to use as a furniture store (Lease). The term of the Lease ran from May 15, 2002 to June 14, 2003. Another tenant--Thornton House furniture store--also occupied a portion of Tebo's building, including the portion with the freight elevator. Thornton House used the freight elevator to move furniture between the basement and its portion of the first floor.

On January 30, 2003, Molinari and Tebo executed an amendment to the Lease, extending the lease term five years, from June 15, 2003 to June 14, 2008, and adding 1,200 square feet of additional retail space on the building's first floor (Amendment). The Amendment is not included in the record on appeal.

Thornton House eventually vacated its portion of Tebo's building, and on September 16, 2005, Molinari and Tebo executed an addendum to the Lease as amended (Addendum) for Molinari to lease the entire building, including the freight elevator. The term of the Lease remained the same, and the rent increased annually over the remainder of the Lease.

The specific Lease and Addendum provisions relevant to this appeal are described more fully in the Discussion that follows.

Molinari took possession of the entire building under the Addendum on or about September 27, 2005. For three days, Molinari used the elevator several times a day to move furniture between the basement storage area and the first floor display area. On

2

October 4, 2005, Molinari used the elevator one time. On that occasion the elevator descended to the basement but would not go back up to the first floor.

Molinari called Tebo to tell him the elevator was broken. During the conversation either Tebo asked or Molinari stated that he would call an elevator company to look at the elevator. Molinari then contacted Elevator Technologies to determine the cause of the malfunction. Elevator Technologies inspected the elevator at the end of October 2005. Molinari then requested a written bid from Elevator Technologies for fixing the elevator.

Elevator Technologies prepared a written service repair proposal estimating it would cost $7,800 to fix the elevator, which Tebo accepted. Tebo paid Elevator Technologies a $4,000 deposit to begin work on the elevator and the remaining $3,800 was due upon state inspection of the elevator and before Elevator Technologies would return the elevator to service.

Elevator Technologies repaired the elevator in December 2005, but it was non-operational until the California Division of Occupational Safety and Health (OSHA) inspected it. On January 19, 2006, OSHA and Elevator Technologies inspected the elevator. The elevator passed the inspection, and to expedite return of the elevator to service, Molinari agreed with Tebo to pay Elevator Technologies the remaining $3,800, which was to be deducted from the next month's rent. Elevator Technologies returned the elevator to service on January 19, 2006.

On January 20, 2006, the day after the inspection, the elevator fell to the basement floor and began emitting smoke the first time Molinari tried to use it. That was the last time the elevator functioned.

Molinari called Tebo and told him the elevator fell and that oil was missing from the reservoir. Molinari also called Elevator Technologies, which sent a crew to inspect the elevator. Elevator Technologies confirmed oil was missing from the elevator and concluded the hydraulic jack unit which pushes the elevator up had failed and the oil had

3

leaked underground. Elevator Technologies later verbally estimated it would cost between $40,000 and $100,000 to fix the elevator.

Nearly a month after the elevator failed the second time, Molinari called Tebo's office in Colorado to ask about the status of repairing the elevator and left a message with the receptionist. Molinari called Tebo six days later and left another message again requesting information on the elevator's status.

On March 6, 2006, Molinari phoned Tebo and told him it would cost approximately $40,000 to repair the elevator. Tebo asked Molinari to get a written bid. Although Molinari requested Elevator Technologies prepare a written bid, he never obtained one, and Molinari never provided Tebo with a written bid for fixing the elevator. March 2006 was the last time Molinari personally spoke with Tebo prior to filing this lawsuit a year later.

In the summer, Molinari began looking for a new location to operate his furniture business. Molinari executed a purchase agreement for a new building in Lodi in October 2006. The sale closed and title transferred to Molinari on December 22, 2006.

Six days before the sale closed, counsel for Molinari wrote to Tebo about the elevator issues and asserted that it was Tebo's responsibility to maintain the elevator.

On December 21, 2006, counsel for Tebo responded in writing that Tebo had been notified that Molinari had a contract to purchase a building in Lodi for its retail operation. This letter stated, "[i]f your client's main objective is seeking to defeat the lease in an effort to free them up to eliminate their obligation so they can move, we are going to have a problem. [¶] If your client's object [is] simply how to effectively address the proper functioning of the elevator, Mr. Tebo is open to discussing what may need to be done to the elevator and how to best deal with that situation." Neither Molinari nor his counsel ever contacted Tebo in response to his counsel's letter.

On February 20, 2007, OSHA issued an order prohibiting the elevator's use until the oil leak was found and repaired. The order prohibiting use was served on Molinari

4

but not Tebo. On February 26, 2007, counsel for Tebo emailed Molinari's counsel stating that Tebo was aware the state inspector had identified a problem with the elevator and that his elevator maintenance contractor would be reviewing the maintenance issue in the coming days.

Two days later Molinari's counsel responded that Tebo had known about the elevator problem prior to leasing the property to Molinari. Counsel also stated that Molinari was vacating the premises on April 1, 2007, and demanded reimbursement for loss of use of the elevator, legal expenses, and moving costs for relocating Molinari's business to a new building. Molinari's counsel also threatened litigation in the event the parties did not settle the matter by March 15, 2007.

On March 1, 2007, Tebo's counsel emailed Molinari's counsel requesting a copy of the OSHA notice since Tebo had not been served with a copy. That same day, Molinari's counsel responded that he would send the original OSHA notice, together with a subsequent notice, the following Monday. By Tuesday, March 6, 2007, Tebo still had not received the OSHA notices so his counsel again requested copies from Molinari's counsel.

On March 14, 2007, Molinari filed a complaint against Tebo for breach of the Lease. Molinari alleged Tebo knowingly leased him a defective elevator under the Addendum, failed to provide the building and elevator in good operating condition, and failed to provide the building and elevator free of material defects. Molinari sought damages for loss of use of the elevator and portions of the building and for lease payments for the elevator and building.

On March 22, 2007, based on the OSHA notices, Tebo obtained a written estimate in the amount of $5,958 from Otis Elevator Company to repair an oil leak caused by defective packing. Ten days later on April 1, 2007, and over a year before the Lease was set to expire, Molinari vacated Tebo's building. Tebo unsuccessfully attempted to re-lease the premises.

Tebo answered Molinari's complaint in July 2007, specifically and generally denying the allegations and alleging various affirmative defenses including that Molinari leased the entire building "as-is" and that under the Lease it was Molinari's responsibility to repair and maintain the elevator. Tebo also filed a cross-complaint alleging Molinari improperly vacated prior to the Lease's expiration in June 2008. Tebo sought to recover $88,965.06 as damages for the remaining lease payments due from April 1, 2007 through June 14, 2008. Tebo also requested the trial court award it $5,958 for the bid amount estimated by Otis Elevator Company to repair the elevator.

A month after Tebo filed his cross-complaint and nearly a year after Molinari vacated Tebo's building, Molinari paid Capitol Elevator Co., Inc., to inspect the Tebo elevator. Capitol Elevator prepared a written bid for Molinari estimating it would cost $57,300 to repair the elevator. Molinari did not give the Capitol Elevator bid to Tebo until the time of trial.

Following a one-day court trial on October 13, 2010, the parties submitted the matter for decision. Prior to submitting the matter, neither party requested the court issue a statement of decision. The trial court orally announced its decision on November 2, 2010. The record does not contain a reporter's transcript for the November 2 proceeding.

On November 9, 2010, the trial court entered judgment in favor of Tebo and against Molinari on the cross-complaint. The court awarded Tebo $88,965.05 in damages plus prejudgment interest and attorneys' fees and costs. Molinari was denied all relief on his complaint. Molinari appeals.

DISCUSSION

I

*Choice of Law*

Although the Lease and the Addendum contain conflicting choice of law provisions, neither party addressed the appropriate governing law. Instead, both parties

6

proceed under the assumption that California law applies to the present dispute. Before this court can resolve the appeal, it first must determine which law governs.

According to section 29 of the Lease, the Lease is governed by the law of the state in which Tebo's building is located--California. Section 7 of the Addendum, however, provides that the agreement "shall be governed by and construed in accordance with the laws of the State of Colorado . . . ." Section 5 of the Addendum further provides that "[a]ll other terms and conditions contained in the Lease shall remain in full force and effect *except as specifically set forth herein*." While the parties originally chose California law to apply, the parties subsequently negotiated for Colorado law to govern. That law controls so long as the Addendum's Colorado choice of law provision is enforceable.

When a choice of law provision has been negotiated at arm's length, the law of the state chosen by the parties will apply as long as the chosen state has a substantial relationship to the parties or their transaction or there is any other reasonable basis for the parties' choice of law and as long as the chosen state's law is not contrary to a fundamental policy of California. (*Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 466.) A substantial relationship is present when at least one of the parties resides in the chosen state. (*Id.* at p. 468 [Hong Kong--the chosen state--had substantial relationship to the parties in a breach of contract action where two of the parties were incorporated under the laws of Hong Kong and had registered offices there].)

Because Tebo resides in Colorado and conducts his business from that state, a reasonable basis existed for choosing Colorado law to govern the relationship between Tebo and Molinari when leasing Tebo's commercial building. Furthermore, there is nothing in the record, nor has this court found anything, to suggest applying Colorado law to the contractual dispute between the parties would be unduly oppressive or unconscionable or would result in substantial injustice. Thus, there is no basis for refusing to enforce the Colorado choice of law provision in the Addendum.

Even where parties properly choose another jurisdiction's law to govern their contract, not all laws of the chosen state will apply. "It is true that while courts generally enforce substantive rights created by the laws of other jurisdictions, procedural laws of the forum state are to be applied." (*Roberts v. Home Insurance Indemnity Company* (1975) 48 Cal.App.3d 313, 318.) Thus, while Colorado law governs substantive issues on appeal, California law applies to procedural questions. "Whether a particular question is one of substance or procedure is determined by forum law." (*Id.* at p. 318.) With these basic rules in mind, we turn to Molinari's contentions on appeal.

II

*Standard of Review*

The parties dispute the applicable standard and scope of review on appeal. Molinari urges the court to interpret the Lease and Addendum de novo to determine whether a breach occurred. Tebo argues the substantial evidence standard of review applies under the doctrine of implied findings. Both parties are partially correct.

Under California law, "the terms 'practice' and 'procedure' include the mode of procedure by which a legal right is enforced as distinguished from the substantive law which gives or declares the right." (*World Wide Imports, Inc. v. Bartel* (1983) 145 Cal.App.3d 1006, 1012.) " 'The process of determining on appeal whether error was committed by the trial court during the trial of the cause, and if so, whether such error is prejudicial and therefore constitutes a ground for reversal, is a matter of practice and procedure.' " (*Id.* at p. 1013, quoting *Bohme v. Southern Pac. Co.* (1970) 8 Cal.App.3d 291, 297-298, overruled on other grounds by *Lund v. San Joaquin Valley Railroad* (2003) 31 Cal.4th 1, 11.) Because the appropriate standard of review constitutes the lens through which this court determines whether the trial court committed reversible error, the standard and scope of review on appeal constitute matters of practice and procedure governed by California law.

8

In California, "[a] judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. [Citations.]" (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 (*Arceneaux*).) Generally, appellate courts independently review questions of law and apply the substantial evidence standard to a superior court's findings on questions of fact. (See *People v. Cromer* (2001) 24 Cal.4th 889, 893-894 [questions of law are subject to de novo review and questions of fact are reviewed under deferential substantial evidence standard].)

In a nonjury trial, the trial court is required to render a statement of decision on the timely request of a party, explaining the factual and legal basis for its decision as to each of the principal controverted issues for which the statement was requested. (Code Civ. Proc., § 632.) On appeal, the statement of decision provides a record of the trial court's reasoning on particular disputed issues, which the appellate court may review in determining whether the court's decision is supported by the evidence and the law. (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 647.)

Where a party fails to request a statement of decision, the doctrine of implied findings applies. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267 (*Shaw*).) "This doctrine requires that in the absence of a statement of decision, an appellate court will presume that the trial court made all factual findings necessary to support the judgment for which substantial evidence exists in the record." (*Ibid.,* fn. omitted.) In other words, the court implies the necessary findings of ultimate facts "and the only issue on appeal is whether the implied findings are supported by substantial evidence." (*Ibid.*)

Under the substantial evidence standard of review, the court views the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 (*Jessup Farms*); *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427,

429 [substantial evidence rule].) Evidence is "substantial" for purposes of this standard of review if it is "of 'ponderable legal significance,' 'reasonable in nature, credible, and of solid value' . . . . [Citations.]" (*Grappo v. Coventry Financial Corp.* (1991) 235 Cal.App.3d 496, 507.)

Molinari did not request a statement of decision during the one-day nonjury trial. The doctrine of implied findings therefore limits this court's scope of review on appeal. We must presume the trial court impliedly made every factual finding necessary to support the judgment, and we review the record to determine whether substantial evidence supports the implied findings. (*Arceneaux, supra,* 51 Cal.3d at p. 1133; *Shaw, supra,* 170 Cal.App.4th at pp. 267-268.) However, the court interprets the language of the Lease and Addendum de novo to determine whether, on the facts so found, any breach occurred. (*Principal Mut. Life Ins. Co. v. Vars, Pave, McCord & Freeman* (1998) 65 Cal.App.4th 1469, 1477-1478 [interpretation of a lease presents a question of law which court independently reviews using principles of contract law].)

III

*Total Destruction Clause*

Molinari argues the trial court erred in finding he breached the Lease because the Lease had already terminated under Lease sections 9.1 and 9.4--the "Total Destruction" clause--by the time he vacated the building. According to Molinari, the Lease terminated under the "Total Destruction" clause in May 2006, sixty days after Molinari informed Tebo in March 2006 that it would cost approximately $40,000 to repair the elevator. We disagree.

Section 9.1(a) of the Lease defines "Premises Total Destruction" as "damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 3 months or less from the date of the damage or destruction and/or the cost thereof exceeds a sum equal to 6 months' Base Rent. Lessor shall notify Lessee in writing within 30 days

10

from the date of the damage or destruction as to whether or not the damage is Partial or Total." Section 9.4 of the Lease provides in pertinent part, "[n]otwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction." Thus, under sections 9.1 and 9.4, if damage to the premises' improvements occurs that will cost more than six months' base rent to repair, then the Lease automatically terminates 60 days after the date of the destructive event.

Assuming the elevator constitutes an improvement to the leased Premises within the meaning of Lease section 9.1, the court must compare the cost of six months' base rent to the cost of repairing the elevator to determine whether the Lease terminated under the "Total Destruction" clause. If the elevator repair cost less than six months' rent, then the Lease and Addendum did not terminate under the "Total Destruction" clause.

The Addendum lists the base rent over the remaining course of the Lease. For October 1, 2005 through June 14, 2006, the base rent was $5,907.42 per month. For June 15, 2006 through June 14, 2007, the base rent increased to $6,030.60 per month. The Addendum listed $6,157.38 as the monthly base rent for June 15, 2007 through June 14, 2008. Thus, at a minimum, the elevator repair had to exceed six times the lowest base rent of $5907.42 per month, that is, $35,444.52, to trigger the "Total Destruction" clause under Lease sections 9.1 and 9.4.

The cost to repair the elevator constitutes a question of fact. Because Molinari did not request a statement of decision, the court must presume the trial court impliedly found it would cost less than $35,444.52 to repair the elevator so long as substantial evidence in the record exists to support the implied finding. (*Shaw, supra,* 170 Cal.App.4th at p. 267.) The record contains substantial evidence to support the finding.

During trial, Tebo presented evidence that it would cost approximately $5,958 to repair the elevator based on an oil leak caused by defective packing. This amount was based on the written bid prepared by Otis Elevator Company in response to the OSHA notices. While Molinari presented conflicting evidence that merely repacking the

11

elevator would not fix it, and that instead the elevator's failure was caused by a defective hydraulic jack that would cost approximately $40,000 to $57,300 to repair based on the verbal bid given by Elevator Technologies and the subsequent written bid prepared by Capitol Elevators, the trial court was free to accept Tebo's evidence and reject the evidence presented by Molinari. (*Hicks v. Reis* (1943) 21 Cal.2d 654, 659-660 [trial court is entitled to reject the testimony of a witness *in toto*, even if that testimony is uncontradicted].)

The doctrine of implied findings compels us to conclude the trial court believed Tebo's evidence and impliedly found the cost to repair the elevator was approximately $5,958. Having resolved the factual issue regarding the cost to repair the elevator in favor of the judgment (*Jessup Farms, supra,* 33 Cal.3d at p. 660), the next step in the analysis is to compare the repair cost to six months' base rent. Under the terms of the Addendum, at a minimum, six months' base rent equaled $35,444.52. The $5,958 elevator repair cost, which this court is bound to uphold, is obviously less than $35,444.52. As it would cost less than six months' base rent to repair the elevator, the repair did not constitute a "Total Destruction" within the meaning of sections 9.1 and 9.4 of the Lease. The Lease, therefore, did not terminate in March 2006.

On appeal, Molinari also argues that six months' base rent could conceivably equal $10,800, which is calculated by multiplying six times the $1,800 increase in rent in the Addendum for the expanded Lease area that includes the freight elevator. Even assuming the $10,800 were the appropriate figure, which is unlikely since the Addendum specifically identifies the "New Base Rent" for the entire leased premises as ranging from $5,907.42 per month up to $6,157.38 per month, the Otis Elevator Company repair bid for $5,958 is still less than $10,800 and the "Total Destruction" clause would not have been triggered in any event.

Because the court finds that no "Total Destruction" occurred as a result of the elevator breaking the second time, it is unnecessary to decide whether Molinari was

required to provide Tebo with notice under sections 9.6 or 13.6 of the Lease prior to vacating as Tebo argues.

IV

*Refusal to Repair the Elevator*

Molinari next argues that even if the Lease did not terminate by its own terms under the "Total Destruction" clause, Tebo breached sections 7.2 and 4.2 of the Lease by refusing to provide a working elevator. The absence of a statement of decision again compels us to reject Molinari's argument.

Section 7.2, titled "Lessor's Obligations," provides in pertinent part: "Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 4.2 (Common Area Operating Expenses), 6 (Use), 7.1 (Lessee's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Lessor, subject to reimbursement pursuant to Paragraph 4.2, shall keep in good order, condition and repair the foundations, exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system, Common Area fire alarm and/or smoke detection systems, fire hydrants, parking lots, walkways, parkways, driveways, landscaping, fences, signs and utility systems serving the Common Areas and all parts thereof, as well as providing the services for which there is a Common Area Operating Expense pursuant to Paragraph 4.2."

Section 4.2, titled "Common Area Operating Expenses," provides in relevant part that "Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share (as specified in Paragraph 1.6) of all Common Area Operating Expenses . . . ." Subdivision (a) of section 4.2 then defines "Common Area Operating Expenses" as including nine separate categories, including subsection (i)(aa), encompassing repair of elevators, and subsection (viii), "[t]he cost of any Capital Expenditure to the Building or the Project not covered under the provisions of Paragraph 2.3 provided; however, that Lessor shall allocate the cost of any such Capital Expenditure

13

over a 12 year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such Capital Expenditure in any given month."

We may assume, although we do not decide, that it was Tebo's responsibility under sections 7.2 and 4.2 of the Lease to fix the elevator based upon the fact that although Tebo requested as damages lost rental payments in the amount of $88,965.06 and the $5,985 cost of repairing the elevator, the trial court apparently limited Tebo's damages to only the lost rental payments plus interest thereby implicitly determining it was Tebo's and not Molinari's obligation under the Lease to fix the elevator. But the question then becomes whether Tebo in fact refused to repair the elevator. This is a question of fact. Because the trial court determined Tebo did not breach the Lease, we must presume, under the doctrine of implied findings, that the trial court impliedly found Tebo did not refuse to repair the elevator. (*Arceneaux, supra,* 51 Cal.3d at p. 1133; *Shaw, supra,* 170 Cal.App.4th at pp. 267-268.) The record contains substantial evidentiary support for this implied finding.

The evidence at trial showed the following: When the elevator initially broke in October 2005, Molinari obtained a written bid from Elevator Technologies for Tebo estimating it would cost approximately $7,800 to fix the elevator. Tebo approved the written bid, paid a $4,000 down payment and authorized Elevator Technologies to begin working on the elevator. Once the elevator was fixed and to expedite returning the elevator to service, Tebo agreed with Molinari that he would deduct $3,800 from Molinari's future rent if Molinari paid the invoice remainder due to Elevator Technologies. Molinari paid Elevator Technologies as agreed, and Tebo credited Molinari $3,800 towards his future rent. Thus, Tebo essentially paid to repair the elevator.

In March 2006, a little over a month after the elevator broke a second time on January 20, 2006, Tebo spoke with Molinari and requested that Molinari obtain a written bid for the cost of repairing the elevator like Molinari had done when the elevator

14

initially broke. Molinari never provided Tebo with a written bid for fixing the elevator, and that was the last time Tebo and Molinari personally spoke before Molinari filed this lawsuit.

Two years before the Lease expired in June 2008, Molinari began looking for new accommodations and by October 2006 Molinari had executed a purchase agreement to buy a new building in Lodi. Six days before the deal closed, Molinari's counsel wrote to Tebo for the first time to discuss the elevator issue. Tebo's counsel promptly responded stating Tebo was "open to discussing what may need to be done to the elevator and how to best deal with that situation." Tebo's counsel also pointed out that, given Molinari had just purchased a new building in Lodi, it appeared Molinari was attempting to avoid his obligations under the Lease. Neither Molinari nor his counsel ever responded to Tebo's letter to discuss the elevator or to rebut the assertion of an improper motive, however.

Tebo also obtained a written bid for $5,958 that was significantly lower than the $40,000 verbal estimate provided by Molinari. Because Tebo previously paid $7,800 to repair the elevator the first time, the trial court reasonably could have inferred that Tebo would have been willing to pay the $5,958 to repair the elevator the second time. (*Arceneaux, supra,* 51 Cal.3d at p. 1133.)

Moreover, when questioned at trial regarding whether in February 2006 it was his intent "to not repair the elevator," Tebo testified that he had asked Molinari to send a written bid and that then they "could work together to get it repaired." Molinari, however, never provided any written bid to Tebo.

In light of the above, the trial court could have impliedly found that Tebo did not refuse to repair the elevator, and that instead, Tebo was willing to repair the elevator based on a written bid which Molinari said he was going to obtain but never did. Given the evidence in the record, this court cannot say the implied finding that Tebo did not refuse to provide a working elevator lacks substantial evidentiary support. Thus, even assuming it was Tebo's responsibility to repair the elevator under Lease sections 7.2 and

15

4.2, the trial court properly found Tebo did not breach these provisions because he did not refuse to repair the elevator.

V

*The Addendum's "As-Is" Provision*

Molinari finally argues that although he agreed to lease the entire building "as-is" when he executed the Addendum, Tebo is nevertheless responsible for repairing the defective elevator and the Addendum's "as-is" clause does not shield Tebo from this obligation. Even if that were true, once again, Molinari's failure to request a statement of decision is fatal to his argument on appeal.

Section 2 of the Addendum, titled "Premises Condition," provides that, "Lessee has inspected the Lease Premises and accepts the Lease Premises in its current condition 'as is' without any warranty of fitness by Lessor." On appeal, Molinari argues that under California law as well as the law of other states, courts weigh various factors including the cost of the repair and the remaining life of a lease to determine whether the lessor or lessee should bear the burden of the repair even if a lease contains an "as-is" clause like the one here. During trial, there was some discussion on the meaning and effect of this "as-is" provision.

We need not decide under Colorado law, or even California law, what substantive rights an "as-is" clause in a short term commercial lease provides to a lessor and lessee. Even if we assume, as Molinari argues, that Tebo bore the responsibility for repairing the elevator notwithstanding the "as-is" clause in the Addendum, the issue again becomes whether Tebo refused to fix the elevator--a factual question. Because we must imply all factual findings to support the judgment (*Shaw, supra,* 170 Cal.App.4th at p. 267), we are constrained to imply the trial court found Tebo did not refuse to repair the elevator. As set forth above, substantial evidence in the record supports this implied finding.

16

Thus, assuming it was Tebo's obligation under the Lease and Addendum to repair the elevator even though Molinari took the property "as-is" when he executed the Addendum, Tebo did not refuse to fix the elevator. Substantial evidence therefore supports the trial court's judgment that Tebo did not breach the Lease and Addendum because he never refused to repair the elevator, and Molinari was not justified in vacating the Lease prior to the designated expiration date of June 14, 2008.

VI

*Conclusion*

In summary, our review leads us to conclude that (1) substantial evidence supports the implied finding that the elevator repair would cost less than $35,444.52 (and even less than $10,800) so that the Lease and Addendum did not terminate under the "Total Destruction" clause found in sections 9.1 and 9.4 of the Lease; (2) substantial evidence supports the implied finding that Tebo did not refuse to repair the elevator even assuming it was his responsibility under sections 7.2 and 4.2 of the Lease and in spite of the "as-is" clause in section 2 of the Addendum; and (3) substantial evidence supports the implied finding that because Tebo did not refuse to repair the elevator, Molinari breached the Lease and Addendum by vacating prior to the June 14, 2008 expiration date. Based on the above, the trial court's judgment denying Molinari all relief on his complaint and awarding Tebo unpaid rent as breach of lease damages on his cross-complaint was correct and supported by substantial evidence.

DISPOSITION

The judgment is affirmed.  Defendant and cross-complainant is awarded his costs on appeal.  (Cal. Rules of Court,, rule 8.278(a)(1).)


      HULL      , Acting P.  J.


We concur:


      BUTZ      , J.


      MAURO      , J.