Filed 1/31/23  Bronte v. Albarez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| ANDREA BRONTE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>RUT GUMETA ALBAREZ,<br><br>    Defendant and Respondent. | D079499<br><br><br><br>(Super. Ct. No. 37-2018-00031659-PR-TR-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert Longstreth, Judge.  Affirmed.

Law Offices of Rosemary Leonard and Rosemary Meagher-Leonard for Plaintiff and Appellant.

Green, Bryant & French and D. Robert Dieringer for Defendant and Respondent.

INTRODUCTION

Before she died in April 2018, Cynthia Bronte executed three revocable trusts to distribute her primary asset, Basiltops, LLC (Basiltops), a pesto sauce company she built.  In a 2014 trust, Cynthia left 75 percent of Basiltops

to her daughter, Andrea Bronte, and the remainder to her employees.[1] In a 2016 trust, Cynthia completely disinherited Andrea, and left the company entirely to her employees. In a 2018 trust, Cynthia left the company to one specific employee, Rut Gumeta Albarez. Andrea, who had a difficult relationship with her mother and had been estranged up until Cynthia's death, remained disinherited.

Two months after Cynthia's death, Andrea filed a petition to invalidate the 2018 trust, asserting that Cynthia lacked capacity to execute it and she had been the victim of undue influence and financial elder abuse by Albarez. Andrea sought to have the 2014 trust declared as the valid and rightful trust of Cynthia's.

At trial, Albarez's attorney asserted that "Andrea need[ed] to knock out both the 2018 trust and the 2016 trust" in order for the 2014 trust to be valid and operative. That is, if the 2016 trust is valid, Andrea could not take under the 2014 trust. Agreeing that issue would be dispositive, the court bifurcated the trial to first determine the validity of the 2016 trust. Andrea's attorney did not object then, nor did she object at any time over the next two days of the bifurcated trial. Andrea conceded that Cynthia signed and executed the 2016 trust, which disinherited her, but argued Cynthia's subsequent conduct evidenced her intent to revoke the 2016 trust. The trial court found the "overwhelming" evidence demonstrated the 2016 trust was validly executed, Andrea had not met her burden to demonstrate revocation, and accordingly it denied Andrea's request to have Cynthia's estate distributed pursuant to the 2014 trust.

---

[1] Because they share the same last name, we refer to Cynthia and Andrea by their first name to avoid confusion. We follow the same rule regarding witnesses who share the same last name.

On appeal, Andrea asserts reversible error on three grounds: (1) the trial court abused its discretion in bifurcating trial; (2) the court failed to rule on all of the issues presented by her petition, including whether the 2018 trust should be invalidated for lack of capacity, undue influence, and financial elder abuse; and (3) the court's findings that the 2016 trust was valid and not revoked "were without factual or legal basis." We reject these contentions and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *Cynthia's Trusts*

On December 11, 2014, Cynthia executed "The Cynthia C. Bronte Trust," a revocable trust (the 2014 trust). (Some capitalization omitted.) Pursuant to the 2014 trust and upon her death, Basiltops was to be distributed 75 percent to Andrea and the remainder to three Basiltops' employees, including 10 percent to Albarez and 5 percent to Tina Crespo. All of Cynthia's personal property was bequeathed to Andrea.

On March 26, 2016, Cynthia executed "The Basiltops Living Trust 3/26/16" (the 2016 trust). She had recently been diagnosed with Stage 4 breast cancer and wanted to settle her estate before undergoing a double mastectomy. Pursuant to the 2016 trust, Cynthia completely disinherited Andrea. The two had been estranged for most of Andrea's adult life. Cynthia expressly declared in the 2016 trust: "I hereby acknowledge the existence of Andrea Bronte and intentionally, with full knowledge, have chosen to exclude her and her descendants under the terms of my trust agreement." Instead, Cynthia left Basiltops entirely to her employees, including Albarez, Crespo, Alicia Simpson, and three others.

3

On April 16, 2018, Cynthia executed "The Cynthia Bronte Trust" (the 2018 trust). (Some capitalization omitted.) This time, Cynthia left all trust property, including Basiltops, "outright" to Albarez only, and to Simpson if Albarez predeceased Cynthia.[2] Andrea remained disinherited under the 2018 trust. The trust instrument stated: Cynthia as "[t]he Settlor is intentionally not providing for Andrea Bronte, Settlor's daughter in this instrument. It is Settlor's intention that Andrea Bronte shall not take part of the trust estate passing under this instrument unless [Albarez and Simpson] predecease [Cynthia] and Andrea Bronte receives a distribution in the manner provided in Section 240 of the Probate Code."[3] (Boldface omitted.)

## II.

### *Andrea's Invalidity Petition*

Cynthia died on April 26, 2018. That June, Andrea filed a "Petition to Determine Existence and Validity of Trust, For Financial Elder Abuse, For Return of Trust Estate Property and For Damages" (invalidity petition). (Some capitalization omitted.) Andrea supplemented the invalidity petition in September 2018 and amended it in June 2019. As supplemented and

---

[2] The same day, Cynthia and Albarez entered into an "Agreement for Purchase and Sale of Assets," in which Albarez purchased from Cynthia "all interests, rights and title" to Basiltops for the sum of $20, to be paid within five days of the execution of the agreement.

[3] "If a statute calls for property to be distributed or taken in the manner provided in this section, the property shall be divided into as many equal shares as there are living members of the nearest generation of issue then living and deceased members of that generation who leave issue then living, each living member of the nearest generation of issue then living receiving one share and the share of each deceased member of that generation who leaves issue then living being divided in the same manner among his or her then living issue." (Prob. Code, § 240.)

4

amended, the invalidity petition sought orders to have the 2018 trust declared invalid, the 2014 trust declared valid, and Albarez held liable for financial elder abuse and damages. Albarez filed a response and objection to the invalidity petition.

In her invalidity petition, Andrea asserted the 2014 trust was the valid and operative trust. She alleged Cynthia "contemplated" creating another trust in 2016, but "while the power of attorney and health directives were signed and notarized, there is no known copy of the 2016 trust." Thus, she asserted, "it appears *unlikely that the 2016 purported trust was ever executed.*" (Italics added.) The invalidity petition contained no allegation the 2016 trust was invalid, for any reason.

Andrea alleged Cynthia lacked capacity and was under the undue influence of Albarez when she executed the 2018 trust on April 16, 2018. On April 24, when Andrea learned of her mother's terminal cancer, Andrea visited Cynthia and stayed with her until she passed away on April 26. Andrea alleged Cynthia told her multiple times during her visit that "she was leaving 'everything' " to Andrea.

## III.

### *Trial*

A. *Bifurcation of Trial on the Validity of the 2016 Trust*

A two-day trial on the invalidity petition began on June 28, 2021. Andrea's attorney waived opening statement. Albarez's attorney, in her opening statement, asserted that Andrea could not take under the 2014 trust for two reasons: "One, the 2018 trust is valid, and assuming it is not, the 2016 trust is valid." Albarez's attorney proffered testimony and documentary evidence would be presented to establish that Cynthia had already completely disinherited Andrea under the 2016 trust, "so that even if the

5

2018 trust is declared invalid, the 2016 trust shall be declared valid and operative such that the estate shall not pass pursuant to the 2014 trust." He explained, "[p]ut more succinctly, Andrea needs to knock out both the 2018 trust and the 2016 trust, which she will be unable to do."

When the trial court perceived the validity of the 2016 trust was "dispositive of the case," it turned to Andrea's attorney and asked if bifurcation on that issue "ma[de] sense." Andrea's attorney responded, "*Right*. I guess -- I guess that is a possibility." (Italics added.) Then, without any objection from Andrea's attorney, the parties presented witnesses and evidence on the validity of the 2016 trust in the first phase of the bifurcated trial.

B.    *Evidence*[4]

1.    *H. Brooks Travis*

H. Brooks Travis is an estate planning attorney. He prepared the 2016 trust for Cynthia in March 2016. Cynthia told Brooks in an initial telephone call that she wanted "the company members," that is "the people who helped her to establish and run her company[,] . . . to benefit" in her trust. Cynthia told Brooks "[s]he had no intent" to leave Basiltops to Andrea and "[i]n fact, she had asked [him] to disinherit her." Although Cynthia did not say why, Brooks knew "she was not close with [Andrea], and she wanted to benefit the people who she was close to." Cynthia also told Brooks she was in "very ill health" and her condition "motivated" her to execute the 2016 trust.

The beneficiaries of the 2016 trust were all Basiltops employees, including Albarez, Simpson, and Crespo. The 2016 trust omitted Andrea as

---

4    We summarize the relevant testimony of witnesses, not in the order they were called, but in approximate chronological order of the events that were the subject of their testimony.

an heir. Cynthia instructed Brooks to include in the 2016 trust a provision that stated: "I hereby acknowledge the existence of Andrea Bronte and intentionally, with full knowledge, have chosen to exclude her and her descendants under the terms of my trust agreement."

Brooks witnessed Cynthia execute the 2016 trust. At no point during the meeting did Cynthia appear "unable to freely converse and understand her affairs." To the contrary, "[s]he was fully conversant" and "[v]ery, very sharp."

2.      *Joan Travis*

Joan Travis is Brooks' wife and his office manager and notary. On March 26, 2016, Cynthia met with Brooks and Joan to execute the 2016 trust. Brooks thoroughly reviewed and discussed the contents of the 2016 trust with Cynthia. Although Joan did not hear Cynthia "literally [say] she wanted to disinherit" Andrea, Cynthia "agree[d] with what Brooks had put in [the trust documents]," and Joan "kn[e]w Brooks only puts in what the client wants."

Joan witnessed Cynthia sign the 2016 trust. She then provided a notary acknowledgment for the 2016 trust and had Cynthia sign her notary journal. Joan explained the original signed trust documents are "always" given to the client, and the law office would "normally" keep a signed copy. Joan, however, had been unable to find Cynthia's file, including a signed copy of the 2016 trust. There had been a recent flood at her home office where the files were kept and she explained, "there is a possibility that it's in a box where it shouldn't be." In 2019, Joan located an unsigned copy of the 2016 trust on the law office's server.

At no point during the meeting did Cynthia appear "confused" about the contents of the 2016 trust or "indecisive" about executing the 2016 trust. Cynthia told Joan she was having surgery, which Joan assumed was for

7

breast cancer, and "she wanted to get [the 2016 trust] done before her surgery. She wanted to make sure that everything was clear in her estate."

3. *Alicia Simpson*

Alicia Simpson worked for Basiltops from 2014 to 2018, as the general office manager. In March 2016, Cynthia became ill with breast cancer and required surgery. Cynthia was "very adamant" about any of her friends telling Andrea about her cancer diagnosis in 2016, or that she was dying in April 2018.

Simpson was aware that Cynthia had executed multiple trusts. She was present when Cynthia signed the 2014 trust. Although she had heard about the 2016 trust, she was not aware that she was named a beneficiary. After Cynthia passed away, Simpson saw a signed copy of the 2016 trust; Albarez had found it in Cynthia's belongings sometime after May 2018. Simpson recalled being served with the invalidity petition and being listed as an interested party to the lawsuit, but she never considered taking a position in the lawsuit, though she did not understand she had a right to do so.

Simpson did not observe any memory decline in Cynthia in 2016 or 2017. She only noticed a memory decline in Cynthia the weekend before she passed away. Simpson helped Cynthia find assisted living or caregiving services in 2016 until her death in 2018. Cynthia had told her that "she'd prefer family take care of her," and so her niece Nancy started to help and Albarez also came over "frequently" to help care for Cynthia.

4. *Rut Gumeta Albarez*

Rut Gumeta Albarez worked for Basiltops from 1997 to June 30, 2018, as Basiltops' kitchen manager. In April 2018, after Cynthia's death, Albarez found the 2014 trust and the 2016 trust in Cynthia's residence. Albarez knew of the 2014 trust because Cynthia had told her, "You are a beneficiary

8

of a little percentage." She also knew she was a beneficiary under the 2016 trust because Cynthia had "mentioned" it to her. Albarez did not remember whether the 2016 trust she found after Cynthia's death was signed or not.

5. *Tina Crespo*

Tina Crespo worked for Basiltops from 2009 to 2016, as the sales and merchandising manager. She had become close friends with Cynthia. But in June 2016, Cynthia abruptly terminated Crespo and that was the last time Crespo spoke with or saw Cynthia. Crespo understood that if the 2014 trust "holds true" that she is "in that trust for 5 percent." Crespo was unaware if her beneficiary status ever changed; she "wasn't really privy to what [Cynthia] was doing right in 2016."

In late 2014, Cynthia's "memory started to go." Crespo explained, "We would have to repeat things to her, things we had discussed the day before, two days before, and sometimes even in meetings where we had just discussed things. [¶] And she would ask us like, . . . this was the first time she was asking us." "[T]he decline was very noticeable when it started to happen," because before that, "she was a very sharp lady."

Cynthia told Crespo "[s]he loved her daughter very much" but "she [wa]s not good at relationships." Crespo had seen Cynthia terminate relationships with people "in a very quick and sudden manner." Although Cynthia told Crespo in 2014 that she was angry with Andrea and had stopped talking to Andrea, she said nothing about reducing Andrea's inheritance. Cynthia later shared with Crespo that she regretted the estrangement with her daughter. Cynthia also "expressed" that when she passed, she wanted Andrea to "basically become Cynthia" and run Basiltops and get her monthly salary of $2,500.

9

## 6. *Diane Ryan*

Diane Ryan is Andrea's first cousin once removed, although she considers Andrea her niece. Ryan had not seen Cynthia for "15, 20 years" but they reconnected just before Cynthia's 80th birthday party. Besides Ryan's husband, no other family members attended Cynthia's party. Instead, it was "mostly" Basiltops' employees who were there. Cynthia loved Basiltops; she called it her "baby." And at her birthday party, Cynthia told Ryan "her employees were like family to her."

Ryan was unaware of whether Cynthia's cancer had returned after the surgery. They had not spoken for another couple of years before Cynthia died in April 2018, and Ryan learned of her death on Facebook. She attended a memorial service organized by Andrea, where Andrea lovingly eulogized her mother. Cynthia had told Ryan she loved and adored her daughter; "everyone in the family from years ago knew that [Andrea] was the light of Cynthia's eye." Though after Cynthia and Ryan reconnected in March 2016, they "didn't talk about Andrea."

## 7. *Charles Brown*

Charles Brown is a probate and estate planning attorney. Brown could not recall meeting with Cynthia but authenticated handwritten notes he took of a meeting he had with her sometime in 2018. He could not say when the meeting took place or when the notes were prepared. According to his notes, Cynthia told him she wanted to leave 51 percent of Basiltops to Albarez and 49 percent to Andrea.

## 8. *Cheryl Piner*

Cheryl Piner was Brown's secretary, from November 2010 to August 2019. Cynthia was Brown's client from January 17, 2018, up until her death. She never met Cynthia but spoke with her on the phone.

10

Cynthia had provided Brown with the original of the 2014 trust, but not any other trust documents. The 2014 trust documents were contained in a "white 3-ring binder" Cynthia gave to Brown and "[i]f there w[ere] other documents" in the binder, Piner did not recall them.

On January 23 or January 24, 2018, Cynthia called and asked them "to hold off on preparing the trust document[s]. She wasn't sure she wanted to go forward." She then called in "mid-March 2018" and "wanted to know where her trust documents were." Piner reminded Cynthia she had told them to hold off in preparing the documents, and Cynthia responded that she did not recall doing that. So Piner prepared the trust documents, with the certification of trust dated April 4, 2018, and emailed them to Cynthia. Cynthia left a voicemail message with Brown's office on April 14, stating "she had a couple minor corrections" and requested a return phone call. Piner called Cynthia "every day" over the next few weeks, but was unable to reach her.

On May 1, 2018, Piner had "a pretty long phone call" with Andrea, during which Andrea told Piner that Cynthia had passed away and asked Piner "about the will and the trust and the powers of attorneys [they] had prepared." Piner explained to Andrea that the trust documents were prepared but never signed by Cynthia or notarized. Andrea also told Piner "there was a problem with the new trust that excluded Andrea."

9.      *Andrea Bronte*

Andrea, who was around 54 years old at the time of trial, was Cynthia's only child. She had lived in Los Angeles since 1994, while Cynthia lived in San Diego. Asked to describe her adult relationship with Cynthia, Andrea testified: "Our relationship was challenging. It was strained. It was painful. It was unstable. And it was unhealthy."

11

Since Andrea was 19 years old, there were "extended periods of time" where Andrea and Cynthia did not see or communicate with one another. They were estranged 1986 to 1987, 1993 to 1995, 1998 to 2007, 2008 to 2011, and 2014 until two days before Cynthia died on April 26, 2018. According to Andrea, Cynthia had a "substance abuse problem [with marijuana], and that was the source of most of [their] separations."

Between December 2014 and April 2018, Andrea had not seen Cynthia but had emailed her once in March 2015 to wish her mother a happy birthday. That period of estrangement was broken on April 24, 2018, when Andrea's cousin, Nancy, emailed Andrea through "a website called Ancestry.com" to tell her Cynthia was terminally ill. Nancy told Andrea, Cynthia "probably only had a couple days to live and that [Andrea] might want to come down and see her before she passed." Andrea "had no idea that [Cynthia] had a terminal illness."

Andrea immediately went to see Cynthia that same day and when she arrived at Cynthia's apartment, Cynthia "was really happy" to see her. Andrea "interacted" with her mother as much as she could, but Cynthia "was vacillating in and out of lucidity." The day before she died, Cynthia was "really bright and alert." She had moments of lucidity and during one of those moments, Cynthia "casual[ly] mention[ed]" to Andrea, "You know, I'm leaving everything to you."

Cynthia had previously expressed her intention to leave her estate to Andrea. In 2008, Cynthia attempted suicide and left Andrea a note that said, "It's all yours now," which Andrea took to mean Cynthia "was intending to give [Andrea] her entire estate." Andrea was a beneficiary of her mother's estate in the first trust Cynthia created in 1995. There was also a time in

2012 or 2013 when Cynthia "mentioned" to Andrea she wanted Andrea to "financially and personally benefit from her estate."

C.  *Closing Arguments*

Andrea's attorney conceded in closing argument that "whatever the burden of proof is," Albarez had established that Cynthia signed the 2016 trust, even though no one had been able to produce the original or executed copy of the 2016 trust.  Andrea's attorney acknowledged it "would be very difficult for [Andrea] to overcome [that fact], given the certification and the notary page," as testified to by Joan and Brooks Travis.

Still, Andrea's attorney argued the 2016 trust had been revoked by Cynthia.  Counsel argued that Cynthia presented the 2014 trust as "her purported last trust," not the 2016 trust, to Brown when she sought to execute another trust in 2018 to leave 51 percent of Basiltops to Albarez and 49 percent to Andrea.  That fact, Andrea's attorney argued, "certainly suggests that [Cynthia] revoked [the 2016 trust] or changed her mind."  In response to this specific assertion, the trial court asked, "[B]ut we have no evidence whatsoever of that, right?"  Andrea's attorney replied, "Right.  Well, I mean, it doesn't seem to exist."

Andrea's attorney also argued "[m]ultiple witnesses" testified as to "Cynthia's serious decline with her memory," including Crespo who noted a "memory loss in late 2014."  She further argued the testimony established that "despite their problems and their issues," Cynthia and Andrea loved each other.  Ryan and Crespo had testified "Andrea was really the shining star for Cynthia, and that they couldn't imagine a situation when Cynthia would not be providing for her only child."

Albarez's attorney argued revocation of a trust under Probate Code section 15401 required either compliance with the method provided in the

13

trust instrument or a writing signed by the settlor, and there was no evidence that either had occurred. The 2016 trust provided that "any amendment or revocation of [Cynthia's] trust agreement made during [her] life shall be by written instrument, signed by [her] and delivered to [her] trustee." Albarez's attorney argued there needed to be an affirmative showing the 2016 trust was revoked, and not simply a presumption based on "the trust's nonappearance." Regardless, counsel argued, other reasonable inferences could be drawn from the fact that Cynthia did not bring the 2016 trust to her meeting with Brown, including "that it was lost."

D.    *Trial Court's Ruling*

The trial court found there was "overwhelming evidence" that Cynthia intended to create and did in fact execute the 2016 trust, including "testimony that a lawyer and a notary saw it being signed," and the notary's record that Cynthia signed the 2016 trust. The court stated that "under any standard of proof" it would not find the lawyer and his notary wife were "lying" about the execution of the 2016 trust.

The trial court also found Andrea had not established that Cynthia revoked the 2016 trust. Although the court agreed it was "significant" that Cynthia did not bring the 2016 trust to her meeting with Brown in 2018, the court found there was "absolutely no direct evidence that [Cynthia] wanted to revoke" the 2016 trust. The court agreed with Albarez's attorney "there are a lot of inferences" that can be drawn from the fact that Cynthia did not bring the 2016 trust to her meeting with Brown, including "she just forgot she had the 2016 trust."

Finally, the trial court also found the 2016 trust "perfectly consistent" with the evidence that she wanted to leave her company to "the person who has been with her through thick and thin for many, many years." The court

14

credited the testimony that Cynthia regarded her employees as "her family"—noting all her employees were at Cynthia's 80th birthday party but only two family members, "one of which was not Andrea," attended. By contrast, there was evidence consistent with Cynthia's intent to disinherit Andrea, including the estranged relationship and that Cynthia was "telling people not to reach out to her daughter" regarding her illness.

For these reasons, the trial court found the evidence established the 2016 trust was valid and Andrea failed to prove it had been revoked. Consequently, it found that even "if the 2018 trust is found somehow to be invalid, that it would not revert to the 2014 trust. It will revert to the 2016 trust." And "whether the 2016 trust is effective, or the 2018 trust is effective. . . . either way, [Andrea] doesn't have any recovery under . . . either one of those [instruments], and [it] all goes to either one employee or a collection of employees of the company." The court therefore concluded "Phase 1 is dispositive" and denied Andrea's invalidity petition to declare the 2014 trust operative and that Cynthia's estate should be distributed according to the 2014 trust.

In July 2021, the trial court entered judgment denying Andrea's invalidity petition. Andrea timely appealed.

DISCUSSION

On appeal, Andrea asserts the trial court committed reversible error on three grounds: (1) the court abused its discretion in bifurcating trial and trying first the validity of the 2016 trust; (2) the court failed to rule on all of the issues presented by her petition, including whether the 2018 trust should be invalidated for lack of capacity, undue influence, and financial elder abuse;

15

and (3) the court's findings that the 2016 trust was valid and not revoked "were without factual or legal basis." We reject each contention.

I.

*Any Claim of Error as to Bifurcation Is Both Forfeited and Waived*

On the record before us, we conclude Andrea has both forfeited and impliedly waived any claim of error as to the trial court's order to bifurcate and first try the validity of the 2016 trust.

As noted, Albarez's attorney explained, in his opening statement to the trial court, that it was Albarez's position that Andrea would need to "knock out both the 2018 trust and the 2016 trust" to prevail on her invalidity petition and to take under the 2014 trust. Counsel proffered that the evidence would establish the 2016 trust was valid. When the trial court asked "how much overlap" there would be between the witnesses on the existence of the 2016 trust and "everything else," Albarez's attorney explained there was none and they intended to offer two witnesses to "authenticate" the 2016 trust.

The trial court asked, "That's dispositive of the case right? If there's a 2016 trust, [Albarez] win[s], right?" Albarez's attorney agreed it was a dispositive issue. The court then turned to Andrea's attorney and had the following discussion:

> "[Court]: Okay. It seems to me it might make a lot of sense then to bifurcate the case and just try that issue first. Seems like a very simple straightforward issue, as opposed to the many, many issues that are raised by everything else. If you lose on that, we've got the other case. And if you win on that, you've saved a whole lot of effort. Does that make sense to everybody?
>
> "[Counsel]: Your Honor, do you mean to bifurcate the issue of what's the valid trust from what's the value of the business?
>
> "[Court]: No. *I mean to bifurcate the issue of whether the 2016 trust is a valid trust, because we don't -- then we don't have to get*

16

*into the value of the business. We don't have to get into what that capacity was at 2018 and everything else, right?*

"[Counsel]: *Right.* I guess -- I guess *that is a possibility.* The issue I'm having is, I would still need to show what Cynthia was doing in 2018. I mean, we can talk about the 2016 trust and the bifurcated issue, but I would want to present evidence of Mr. Charles Brown, and more importantly, his assistant, Ms. Cheryl Piner, to show that in fact when Mr. Brown was preparing the trust that was not signed, . . . Cynthia, brought to his office or he came to her and brought a copy of the 2014 trust. Not a copy, rather. The original of the 2014 trust. . . .

"[Court]: *All right. I think we're agreeing then.* So the question of what evidence gets presented at Stage 1, we'll address at Stage 1. So if you think that's relevant as to whether there's a 2016 trust, then certainly you can put on any evidence you want to do that. If we then find out that there's no 2016 trust, that we've got to go to all the other issues that are raised, we'll have that evidence already in the record and move forward from there. [¶] It might mean that we call Mr. Brown twice. . . . So let's do it that way. I think that will make a lot of sense. [¶] . . . [¶] Okay. So we'll proceed on that basis. So it sounds like you're going to call Mr. Brown either way. If you want to start with him, that's fine. If you want to start with somebody else, we can do it that way.

"[Counsel]: No. I think I'll start with Mr. Brown." (Italics added.)

Andrea did not object *then* to the trial court's bifurcation order, nor did she object at *any* time over the next two days of the bifurcated trial. Consequently, she has forfeited her right to challenge the ruling on appeal. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2 ["the loss of a right to challenge a ruling on appeal because of the failure to object in the trial court . . . is 'forfeiture' "]; *In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1500 [" 'A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court.' "].) The purpose of the general doctrine of forfeiture is " ' " ' "to encourage a [litigant] to bring errors to the attention of the trial court, so that they may be corrected or avoided

17

and a fair trial had." ' " ' " (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264.)

Although we recognize that "application of the forfeiture rule is not automatic," we are also mindful that "the appellate court's discretion to excuse forfeiture should be exercised *rarely* and only in cases presenting an important legal issue." (*In re S.B., supra*, 32 Cal.4th at p. 1293, italics added.) Andrea has not suggested there is any such important legal issue in this case that would require our discretion to excuse the forfeiture. Indeed, we note that her opening brief on appeal fails to even mention the discussion her attorney had with the trial court regarding bifurcation, which, as we discuss next, demonstrates her acquiescence to the very ruling she now challenges as error.[5] Regardless, we perceive of no reason in this case to depart from the well-established rule that " ' " '[a]n appellate court will ordinarily not consider procedural defects or erroneous rulings, in connection with relief sought or defenses asserted, where an objection could have been but was not presented to the [trial] court by some appropriate method.' " ' " (*In re Carrie W.* (2003) 110 Cal.App.4th 746, 755.)

Further still, Albarez contends that Andrea expressly consented to the trial court's order to bifurcate the issue of the validity of the 2016 trust, and thus her claim of error is foreclosed by the doctrine of waiver. But even "falling short of an express waiver," Albarez asserts Andrea acquiesced in the court's bifurcation order and impliedly waived any claim of error. We agree with Albarez's second contention of implied waiver.

---

[5] An appellant's opening brief must provide an adequate "summary of the significant facts" (Cal. Rules of Court, rule 8.204(a)(2)(C)) and must set forth all material evidence, not just evidence favorable to his or her position (see *People v. Dougherty* (1982) 138 Cal.App.3d 278, 282).

Waiver is the " 'intentional relinquishment or abandonment of a known right.' " (*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475 (*Lynch*).) "Waiver requires an existing right, the waiving party's knowledge of that right, and the party's 'actual intention to relinquish the right.' [Citation] ' "Waiver always rests upon intent." ' [Citation.] The intention may be express, based on the waiving party's words, or implied, based on conduct that is ' "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." ' " (*Ibid.*)

When the trial court explained it intended to bifurcate the issue of whether the 2016 trust was a valid trust for a dispositive phase 1 trial and asked if that "ma[de] sense to everybody," Andrea's attorney responded: "*Right. I guess -- I guess that is a possibility.*" (Italics added.) The trial court then confirmed its bifurcation order and stated, "All right. I think *we're agreeing then.*" (Italics added.) Andrea's attorney not only failed to object, but she did not correct the court's unambiguous statement that the parties agreed to its bifurcation order. The court again confirmed, "Okay. So we'll proceed on that basis."

Next, the court discussed with counsel the scheduling of witnesses on the validity of the 2016 trust, and specifically asked Andrea's attorney, "are you planning [your witnesses] on the 2016 trust issue that we've now separated out?" Andrea's attorney responded, "*Yes.*" (Italics added.) Then over the next two days, Andrea presented witnesses and testimony on the validity of the 2016 trust, as a dispositive matter, without protest.

On this record, we conclude Andrea's acquiescence in the bifurcated trial was " ' "so inconsistent with an intent to enforce the [claimed] right as to induce a reasonable belief that such right has been relinquished." ' " (*Lynch, supra*, 3 Cal.5th at p. 475.) Consequently, she has also impliedly waived any

19

claim of error as to the bifurcation order. (See *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1685–1686 [" 'appellant may waive his [or her] right to attack error by expressly or impliedly agreeing at trial to the ruling or procedure objected to on appeal' "]; *Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 856–857 [holding appellant's acquiescence to the court's definition of a term resulted in waiver of claimed error as to use of that definition]; *Electronic Equipment Express, Inc.,* at pp. 856–857 [distinguishing cases in which parties "alleging error had strenuously made [their] objection and then acted defensively to lessen the impact of the error"].)

In sum, we conclude Andrea has failed to preserve her claim of error for review on appeal. But as we discuss next, even if we overlooked the forfeiture and implied waiver of the claim, we conclude the trial court did not err in bifurcating trial on the validity of the 2016 trust.

## II.

### *The Trial Court Was Within Its Discretion to Bifurcate Trial on the Validity of the 2016 Trust*

Andrea concedes the trial court had authority under Code of Civil Procedure[6] section 598 to order bifurcation on its own motion. She further explains she does *not* take issue with the trial court's order to bifurcate the matter, "but, rather, that the first tried issue [was] on the existence and validity of the 2016 trust, which the . . . court deemed to be dispositive." So her challenge goes essentially to the court's management of the order of proof. We conclude the trial court had ample authority to make this discretionary

---

[6]     All further undesignated statutory references are to the Code of Civil Procedure.

decision, and no abuse of that discretion appears on this record. (*Grappo v. Coventry Financial Corp.* (1991) 235 Cal.App.3d 496, 504 (*Grappo*) [trial court's bifurcation order reviewed for abuse of discretion].)

A trial court has "broad discretion to determine the order of proof in the interests of judicial economy." (*Grappo, supra,* 235 Cal.App.3d at p. 504.) As Andrea acknowledges, Code of Civil Procedure section 598 gives the trial court power to order "that the trial of any issue or any part thereof shall precede the trial of any other issue or any part thereof in the case, except for special defenses," not at issue here, "when the convenience of witnesses, the ends of justice, or the economy and efficiency of handling the litigation would be promoted thereby." (Code Civ. Proc., § 598; see *Grappo*, at p. 504.) In addition to Code of Civil Procedure section 598, "Evidence Code section 320 provides that '[e]xcept as otherwise provided by law, the court in its discretion shall regulate the order of proof.' Similarly, Code of Civil Procedure section 1048, subdivision (b) states that a trial court, 'in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any cause of action . . . or *of any separate issue* or of any number of causes of action or issues[.]' " (*Grappo*, at p. 504, italics added.) These statutory provisions reflect the well-established principle that "courts have fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation before them." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967; *ibid.* ["The Legislature has also recognized the authority of courts to manage their proceedings and to adopt suitable methods of practice."].)

Here, the trial court's decision to bifurcate and first try the issue of the validity of the 2016 trust was based on an efficient path to Andrea's ultimate

claim—that the 2014 trust was the valid and rightful trust of Cynthia's. Had Andrea first presented evidence, and prevailed, on her claim the 2018 trust was invalid because Cynthia lacked capacity and was under the undue influence of Albarez when she executed the 2018 trust, distribution of Cynthia's estate would not automatically revert to the 2014 trust. There was still the 2016 trust, under which Andrea had been completely disinherited. The inefficiency of first trying the 2018 trust is obvious. The trial court setting the order of proof in the way that it did arose from the necessity of establishing the invalidity of the 2016 trust before Cynthia's estate could be distributed under the 2014 trust. The decision is *not* " 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) It is sound trial management.

We are not persuaded to the contrary by Andrea's arguments. Andrea first contends section 598 "makes it clear that in order for the first part of a bifurcated trial to be dispositive of the entire case, the first trial must have included *all causes of action concerning liability*." (Boldface omitted, italics added.) She bases this contention solely on the following language in section 598: "Where trial of the issue of liability as to all causes of action precedes the trial of other issues or parts thereof, and the decision of the court, or the verdict of the jury upon such issue so tried is in favor of any party on whom liability is sought to be imposed, judgment in favor of such party shall thereupon be entered and no trial of other issues in the action as against such party shall be had unless such judgment shall be reversed upon appeal or otherwise set aside or vacated." Andrea does not develop the argument or cite to any authority to support her reading of section 598, and we could very well reject it on that basis alone. (See *Hernandez v. First Student, Inc.* (2019)

22

37 Cal.App.5th 270, 277 (*Hernandez*) [" '[O]n appeal "the party asserting trial court error may not . . . rest on the bare assertion of error but must present argument and legal authority on each point raised." ' "].)

Regardless, we do not construe Code of Civil Procedure section 598 to require a trial court to try "all causes of action concerning liability" (boldface omitted) in a bifurcated trial for it to be "dispositive of the entire case." The language quoted by Andrea provides only that where "the *issue* of liability as to all causes of action" is determined in favor of a party, "judgment in favor of such party shall thereupon be entered." (Code Civ. Proc., § 598, italics added.) That is what occurred here. Other than advancing an incorrect interpretation of Code of Civil Procedure section 598, Andrea does not refute the premise of the trial court's bifurcation order that the validity of the 2016 trust was dispositive of all claims in her invalidity petition. Once that dispositive issue as to all claims was determined in Albarez's favor, the court entered judgment in her favor. Moreover, Andrea's interpretation ignores the first paragraph of Code of Civil Procedure section 598, which confers broad discretion on the trial court to bifurcate "the trial of any issue" to promote the "ends of justice, or the economy and efficiency of handling the litigation" (Code Civ. Proc., § 598), as well as Evidence Code section 320 and Code of Civil Procedure section 1048, subdivision (b).

Andrea also contends the trial court erred in its bifurcation order because she was not permitted to present evidence on "the issues of the value of the [Basiltops] business, the procurement of the 2018 trust, and the validity of the 2014 trust." This is but a recast of her argument that the trial court erred in its management of the order of proof, which we have already rejected, and she does not explain how these other issues were relevant to the validity of the 2016 trust.

Andrea also did not request to present evidence on these other issues. Indeed, after Andrea finished testifying, the trial court asked her attorney whether she had any other witnesses to call in phase 1 of the bifurcated trial. Andrea's attorney responded, "[O]n this issue, no, I do not, your Honor." After stating its findings and ruling, the court asked whether "anybody want[ed] to address any aspect of [its] reasoning or . . . statement." Andrea's attorney responded, "No, your Honor." Notably, Andrea's attorney did not assert, despite the trial court's finding that phase 1 of the bifurcated trial was dispositive, that she be allowed to present additional evidence regarding any other issues raised by the invalidity petition, including the validity of the 2018 trust. To preserve the right to challenge on appeal the erroneous exclusion of evidence, the appellant must make a timely and proper objection or motion to admit the evidence, clarifying the specific ground for the motion. (See Evid. Code, § 353, subd. (a); *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 563–565.)

Finally, Andrea contends the trial court erred because while it tried the validity of the 2016 trust, there "was not even a determination as to whether the 2016 trust was a product of undue influence or whether Cynthia lacked capacity to execute the 2016 trust." We reject this assertion. Andrea did not allege Cynthia lacked capacity or was under the undue influence when she executed the 2016 trust. As the trial court correctly observed, her invalidity petition asserted only that there "is no known copy of the 2016 trust" and thus "it appears unlikely that the 2016 purported trust was ever executed." The petition did not contain any allegation the 2016 trust was invalid, for any reason. And at trial, she conceded the 2016 trust was signed and executed, but asserted it had been revoked by Cynthia.

24

In sum, we conclude the trial court was well within its discretionary authority to bifurcate trial on the validity of the 2016 trust.

## III.

*Andrea's Due Process Rights Were Not Violated When the Trial Court Declined to Consider Other Remaining Non-Dispositive Issues*

Andrea contends the trial court's failure to rule on all prayers for relief contained in her invalidity petition—including whether the 2018 trust was invalid for lack of capacity, undue influence, and financial elder abuse—resulted in a denial of her rights to due process under the constitutions of the United States and California "to fully present her case at trial." Not so.

"The touchstone of due process is fundamental fairness."[7] (*Salas v. Cortez* (1979) 24 Cal.3d 22, 27.) "The primary purpose of procedural due process is to provide affected parties with the right to be heard at a meaningful time and in a meaningful manner." (*Ryan*, *supra*, 94 Cal.App.4th at p. 1072.) Due process, " ' "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and

---

[7] The guarantee of due process under the constitutions of the United States and California is substantially similar. (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 212.) Although "procedural due process under the California Constitution is 'much more inclusive' and protects a broader range of interests than under the federal Constitution" (*Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1069 (*Ryan*)), the distinction is immaterial here, and Andrea does not argue otherwise. In analyzing Andrea's claim, we treat the relevant due process principles under federal and California constitutions as the same. (Cf. *Today's Fresh Start, Inc.*, at p. 212 [California Supreme Court relying on "the United States Supreme Court's precedents for guidance in interpreting the contours of our own due process clause"].)

circumstances." ' " (*Barclay Hollander Corp. v. California Regional Water Quality Control Bd.* (2019) 38 Cal.App.5th 479, 510.) It is a flexible concept that " ' "calls for such procedural protections as the particular situation demands." ' " (*Ibid.*) A due process analysis "adopts a more nuanced and pragmatic approach," whereas " '[a] construction of the Due Process Clause which would place *impossible* or *impractical* obstacles in the way could not be justified.' " (*Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 981, italics added.) Because of this flexible and pragmatic approach, "not every context to which the right to procedural due process applies requires the same procedure," nor does "every situation require[ ] a formal hearing accompanied by the full rights of confrontation and cross-examination." (*Ryan*, at p. 1072.)

Andrea contends the guarantee of due process entitled her to a full trial on the remaining issues raised in her invalidity petition, even though the trial court's finding that the 2016 trust was valid had rendered those remaining issues immaterial. Other than section 598, she does not direct us to any authority for this proposition. (See *Hernandez, supra*, 37 Cal.App.5th at p. 277 [" '[O]n appeal "the party asserting trial court error may not . . . rest on the bare assertion of error but must present argument and legal authority on each point raised." ' "].) And as we have already concluded, the trial court's bifurcation order and management of the order of proof was proper under section 598. Under these circumstances, due process does not require a futile trial on the remaining issues, the result of which would not lead to a different outcome.

IV.

*Substantial Evidence Supports the Trial Court's Findings That the 2016 Trust Was Valid and Not Revoked*

Andrea contends there was not substantial evidence to support the trial court's findings that the 2016 trust was valid and not revoked. We disagree.

When a party challenges a trial court's determination of disputed factual issues, we review the findings for substantial evidence. (*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 969.) " 'Substantial evidence means evidence which is of ponderable legal significance—evidence which is reasonable in nature, credible and of solid value.' " (*Ibid.*) " ' "[A]ny conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." ' " (*Ibid.*) " 'We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment. [Citation.]' [Citation.] The testimony of a single witness may be sufficient to constitute substantial evidence." (*Ibid.*) "Our job is only to see if substantial evidence exists to support the verdict in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 (*Schmidt*).)

A party challenging a trial court's factual determinations thus bears an " ' "enormous burden" ' " on appeal. (*Schmidt, supra,* 44 Cal.App.5th at p. 582.) This burden is even weightier where, as here, "the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden[.]" (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279 (*Shaw*).) In such a case, "the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of

27

such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Ibid.*, quoting *Roesch v. De Mota* (1944) 24 Cal.2d 563, 571.) As another court aptly put it, where an appellant bears the burden of proof at trial, "it is almost impossible for him [or her] to prevail on appeal by arguing the evidence compels a judgment in his [or her] favor. That is because unless the trial court makes specific findings of fact in favor of the losing plaintiff, we presume the trial court found the plaintiff's evidence lacks sufficient weight and credibility to carry the burden of proof." (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.) We conclude Andrea has failed to carry this enormous burden on appeal.

Under California law, a trust requires a declaration of intent that property be held in a trust, trust property, and a beneficiary. (See Prob. Code, § 15200 et seq.) " 'In construing trust instruments, as in the construction and interpretation of all documents, the duty of the court is to first ascertain and then, if possible, give effect to the intent of the maker.' " (*Gardenhire v. Superior Court* (2005) 127 Cal.App.4th 882, 888.) Here, there was "overwhelming evidence" to support the trial court's finding that Cynthia intended to create and did in fact execute the 2016 trust. The estate planning attorney who prepared the 2016 trust and his wife who notarized Cynthia's signature both testified they witnessed Cynthia sign the 2016 trust, and she possessed a clear mind when she expressed her intent to disinherit Andrea by the execution of the 2016 trust. Further still, Simpson testified she saw a signed copy of the 2016 trust after Cynthia had passed. For these reasons, Andrea's attorney wisely conceded at trial that "whatever the burden of proof is," Albarez established that Cynthia executed the 2016 trust despite the fact that a signed copy could not be found at trial.

The only issue then was whether Cynthia had revoked the 2016 trust, and Andrea had the burden of proof on this issue.  (See *Tom Thumb Glove Co. v. Han* (1978) 78 Cal.App.3d 1, 5 ["[T]he burden is on the party seeking relief to show by a preponderance of the evidence why he is entitled to it."]; *Key v. Tyler* (2019) 34 Cal.App.5th 505, 528 [the ordinary burden of proof in civil matters extends to probate actions].)  And because the trial court found she failed to meet her burden of proof at trial, Andrea's burden on appeal is to demonstrate that her evidence on revocation was " 'uncontradicted and unimpeached' " and " 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Shaw, supra*, 170 Cal.App.4th at p. 279.)  This she has failed to do.

Probate Code section 15401 governs trust revocation.[8]  Probate Code "[s]ection 15401, subdivision (a) provides that a revocable trust may be revoked either (1) '[b]y compliance with any method of revocation provided in the trust instrument' or (2) '[b]y a writing, other than a will, signed by the settlor or any other person holding the power of revocation and delivered to the trustee during the lifetime of the settlor or the person holding the power of revocation.' " (*Haggerty v. Thornton* (2021) 68 Cal.App.5th 1003, 1008, quoting Prob. Code, § 15401, subd. (a)(1) & (2).)  Whatever method is used to

---

[8]  "A trust that is revocable by the settlor or any other person may be revoked in whole or in part by any of the following methods:

(1) By compliance with any method of revocation provided in the trust instrument.

(2) By a writing, other than a will, signed by the settlor or any other person holding the power of revocation and delivered to the trustee during the lifetime of the settlor or the person holding the power of revocation.  If the trust instrument explicitly makes the method of revocation provided in the trust instrument the exclusive method of revocation, the trust may not be revoked pursuant to this paragraph."  (Prob. Code, § 15401, subd. (a).)

revoke a trust, " '[t]he paramount rule in construing [a trust] . . . instrument is to determine intent from the instrument itself and in accordance with applicable law.' " (*Balistreri v. Balistreri* (2022) 75 Cal.App.5th 511, 516.)

There was *no evidence* presented by Andrea that Cynthia had revoked the 2016 trust by either method specified under Probate Code section 15401.[9] Instead, she argued the fact that Cynthia had presented the 2014 trust, not the 2016 trust, to Brown when she sought to execute another trust in 2018 (that would leave 51 percent of Basiltops to Albarez and 49 percent to Andrea) demonstrated Cynthia's belief that the 2014 trust was "her purported last trust" and "certainly suggests" that Cynthia revoked the 2016 trust or "changed her mind." But in response to the trial court's question that "we have *no evidence* whatsoever of that," Andrea's attorney agreed: "*Right. . . . it doesn't seem to exist*." (Italics added.)

Thus substantial evidence supported the trial court's finding there was "absolutely no direct evidence" that Cynthia intended to revoke the 2016 trust. Rather than adopting the inference Andrea urged, the court reasonably drew other inferences from the fact that Cynthia brought a copy of the 2014 trust to her meeting with Brown, including that she simply forgot she had the 2016 trust. The court further found the evidence consistent with Cynthia's intent to disinherit Andrea and to leave the company to her employees whom she considered to be her family.

On appeal, Andrea cites no specific findings of fact by the trial court in her favor. Instead, Andrea simply reargues the facts and asks us to reweigh the evidence. She insists "that Cynthia *likely* revoked the 2016 trust"

---

9 The 2016 trust provided that any amendment or revocation of it during Cynthia's lifetime "shall be by written instrument, signed by [her] and delivered to [her] trustee."

because both Brooks and Joan Travis testified they did not have a signed copy of the 2016 trust; because no signed copy of the 2016 trust was presented at trial; and because Cynthia brought the 2014 trust—instead of the 2016 trust—to Brown to help her prepare another trust that was never executed in 2018. (Italics added.) As she surely knows, "[a]ppellate courts 'do not reweigh evidence or reassess the credibility of witnesses.' " (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531.) And such arguments are not sufficient to sustain Andrea's " ' "enormous burden" ' " on appeal to demonstrate error in the trial court's factual determinations and express finding that she had failed to meet her burden of proof at trial. (*Schmidt*, *supra*, 44 Cal.App.5th at p. 582; *Shaw*, *supra*, 170 Cal.App.4th at p. 279.)

## DISPOSITION

The judgment is affirmed. Albarez shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

DO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.